**DOLLS, INC., Plaintiff,**

v.

**CITY OF CORALVILLE, IOWA, Defendant.**

No. 4:05–CV–00092–JEG.

United States District Court, S.D. Iowa.

March 24, 2006.

Edward J. Krug, Krug Law Firm, PLC, Cedar Rapids, IA, Luke C. Lirot, Tampa, FL, for Plaintiff.

Terry J. Abernathy, Thad J. Collins, Pickens Barnes & Abernathy, Cedar Rapids, IA, for Defendant.

## ORDER

GRITZNER, District Judge.

This matter comes before the Court on Defendant's Motion to Dismiss (Clerk's No. 9). The Plaintiff, Dolls, Inc., is represented by Edward J. Krug and Luke C. Lirot. The Defendant, City of Coralville, is represented by Terry J. Abernathy and Thad J. Collins. Following a hearing held on Friday, January 20, 2006, this matter is fully submitted and is ready for disposition.

Resolving the pending motion today does not require surveying much of the Supreme Court's rather complex First Amendment jurisprudence applicable to cities' licensing and zoning ordinances regulating whether and where adult-oriented businesses may operate. Instead, this case turns on whether the Plaintiff is the correct party to challenge certain ordinances which have not been applied and, in some instances, cannot be applied, to its business, and, if so, whether it is in the proper posture to do so. The Court resolves both issues in the negative.

## FACTS

The Defendant, City of Coralville, Iowa ("Coralville" or "the City"), is a political subdivision of the State of Iowa located in Johnson County. The Plaintiff, Dolls, Inc. ("Dolls"), is an Iowa corporation with its principal place of business in Coralville, Iowa. The company has been in existence since 1996. Wayne Grell is Dolls' president.

For a number of years, Dolls claims it has operated an establishment "predicated on public appeal in the expressive dance performances performed by independent professional artists" who "receive[d] compensation in the form of gratuities from patrons pleased with the expressive performances presented." Dolls claims it facilitated the provision of

"First Amendment protected dance performances" emphasizing human sexuality. Artists performing there were not nude but were "scantily attired in more than ... 'pasties and g-strings.' "

In 2004, Dolls sold the building it operated and the land upon which the building stood to the City pursuant to the terms of a negotiated Settlement Agreement. Dolls claims its was forced out of business under threat of condemnation as a result of a concentrated effort by the City to rid itself of adult-oriented businesses.[1] Finding a new place for Dolls in Coralville is the focus of this litigation. Coralville, like many communities, has in effect zoning and licensing ordinances governing where businesses, including those like Dolls, may operate.

## I. Coralville's Zoning and Licensing Scheme.

Among the stated purposes of Coralville's comprehensive zoning scheme is "to promote the public health, safety, morals, order, convenience, prosperity and general welfare; [and] to conserve and protect the value of property throughout the City and to encourage the most appropriate use of land ...." Coralville, Iowa, Ordinances, § 165.02 (2005). To that end, Coralville has established a variety of zoning districts, each of which is eligible to house different types of residences or businesses. Three types of industrial zones exist. *See id.* § 165.30–.32. Relevant here are "I–2," or "light industrial districts," and "I–3," or "general industrial districts." *Id.* § 165.31–.32.

I–2 areas are "low impact industrial, business and research area[s] set aside for the location of enterprises that have negligible environmental impacts beyond their property limits." *Id.* § 165.31. The minimum lot size for these types of areas is 10,000 square feet. *Id.* § 165.31(6)(A). Only certain types of businesses may operate in I–2 areas, some with and some without a provisional, conditional use, or special exception permit issued by the City Zoning Administrator ("Administrator") and the City's Board of Adjustment ("Board"). *See id.* § 165.31(2)-(5).

Land zoned I–3 is to be "a general purpose industrial and business area for the location of activities and enterprises that might be otherwise objectionable in other areas of the community and by the nature of their activity may result in some negative impacts upon their environment." *Id.* § 165.32. The stated purpose of I–3 districts "is to provide for such uses in the community and to properly insure their negative impacts are properly mitigated." *Id.* Left unexplained are these "negative impacts" or how these enterprises could be "otherwise objectionable" to surrounding property owners. *See id.* The minimum lot size for land zoned I–3 is 250,000 square feet, or just under six acres. *Id.* § 165.32(6)(A).

Only waste water treatment plants may operate in I–3 areas without some kind of license. *Id.* § 165.32(2)(A). Other businesses require provisional use permits issued by the Administrator, *id.* § 165.32(3), conditional use permits issued by the Board, *id.* § 165.32(4), or special exception permits issued by the Board, *id.* § 165.32(4). Requiring conditional use permits are "[s]exual activity establishment[s],[2] massage establishment[s],[3] adult

---

1. At oral argument, the City indicated one other adult-oriented business was currently in operation in Coralville, but it stood upon land condemned for a pending public works project.

2. A "sexual activity establishment" is

an establishment which excludes minors by reason of age, used for the display of live presentations distinguished or characterized by an emphasis on matter depicting or describing or involving specified sexual activities or specified anatomical areas. Provided, the provisions of this definition shall

bookstore[s],[4] adult cabaret[s],[5] adult motion picture theater[s],[6] or other similar forms of adult entertainment" (collectively, "adult-oriented businesses"). *Id.* § 165.32(4)(D). In addition to adult-oriented businesses, the conditional use permit requirement applies to less exotic businesses such as animal by-product rendering facilities, chemical manufacturing plants, slaughter plants, and businesses

conducting quarrying and mining operations. *Id.* § 165.32(4)(A)-(C). In addition to a conditional use permit, some businesses, including adult-oriented businesses, must also submit a site plan, *id.* § 165.32(4)(B)-(D), but only adult-oriented businesses must propose "one non-lighted sign no larger than four square feet," *id.* § 165.32(4)(D).[7]

not apply to a theater, concert hall, art center, museum or similar establishment which is primarily devoted to presentations distinguished or characterized by an emphasis on matter depicting or describing or relating to specified anatomical areas.
Coralville, Iowa, Ordinances § 165.05(114); *see also id.* § 165.05(129) (defining "specified anatomical areas"); § 165.05(130) (defining "specified sexual activities").

**3.** A "massage establishment" is
any establishment having a fixed place of business, which excludes minors by reason of age, where massages are administered for any form of consideration or gratuity, including but not limited to massage parlors, health clubs, sauna baths and steam baths.
Coralville, Iowa, Ordinances § 165.05(85). A number of exceptions exist, mainly related to individuals performing massages who are licensed by the State of Iowa for such purposes. *See id.* § 165.05(85)(A)-(E).

**4.** An "adult bookstore" is
an establishment having as a substantial or significant portion of its stock in trade, books, magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specific anatomical areas or an establishment with a segment or section devoted to the sale or display of such material, or such an establishment which excludes minors by reason of age.
Coralville, Iowa, Ordinances § 165.05(6). The term *"specific* anatomical areas" is not defined by the City's ordinances. *See id.* § 165.29 (defining *"specified* anatomical areas" (emphasis added)).

**5.** An "adult cabaret" is "a cafe or restaurant where patrons are entertained by performers

featuring go-go dancers, exotic dancers, strippers or similar entertainers which excludes minors by reason of age." Coralville, Iowa, Ordinances § 165.05(7).

**6.** An "adult motion picture theater" is
an enclosed building (a) used predominately for presenting, for observation by patrons therein, motion pictures, slides or photographic reproductions which are distinguished or characterized by an emphasis on matters depicting, describing or relating to specified sexual activities or specified anatomical areas, or (b) which excludes minors by reason of age.
Coralville, Iowa, Ordinances § 165.05(8).

**7.** At the time this litigation began, adult-oriented businesses were also required to obtain approval from abutting property owners giving "assurance to the City [that] they do not object to the proposed use." Coralville, Iowa, Ordinances § 165.32(4)(D). The City deleted this provision on July 26, 2005. Coralville, Iowa, Ordinance No. 2005–1018 (2005). Kevin Olson, Coralville's city attorney, represented in an affidavit that the City would also "consider the appropriateness of placing 'adult cabaret' and similar businesses in the I–3 zone," but there is no evidence suggesting the City has done this. Second Olson Aff. ¶ 4. Olson also represented "[t]he City [would] give particular attention to such 'negative impacts' and other secondary effects of adult cabarets and similar businesses," but nothing in the record suggests the City has done this, either. *Id.* ¶ 5. Because Dolls seeks only injunctive and declaratory relief, any claim Dolls may have had as a result of the existence of the neighbor approval provision must be dismissed as moot as any decision passed by the Court on that provision would be advisory.

Nowhere in its Complaint does Dolls challenge the City's site plan procedures, nor does it challenge the City's regulations regarding signs. Dolls only specifically challenges procedures applicable to provisional use permits and special exception permits, which are not required to operate an adult-oriented business. *See, e.g.,* Compl. ¶¶ 36–40. (To this end, the City's Complaint appears to contain a typographical error. *Compare* Compl. ¶ 34 (listing section 165.49 as containing conditional use permit procedures), *with* Compl. exh. H, at 1 (listing section 165.50 as containing conditional use permit procedures)). Elsewhere in its Complaint, Dolls challenges the "conditional use provision[s]" generally, without specifically identifying a section of the City's ordinances. *E.g.,* Compl. ¶ 43. Consequently, the Court will construe Dolls' Complaint as, *inter alia,* a challenge to the City's conditional use permit procedures.

Coralville's ordinances provide detailed procedures regulating when conditional use permits will issue. *See generally* Coralville, Iowa, Ordinances § 165.50. In addition to a fee, an applicant must submit "[s]upporting information" and "documentation" indicating compliance with the City's zoning ordinances. *Id.* § 165.50(1)-(4). The property owner must also submit to the Administrator "[a] signed and attested statement ... indicating compliance with all provisions [of the City's zoning ordinances] and a detailed explanation of any permitted nonconformities on the subject property." *Id.* § 165.50(4). After a complete application is submitted, the Administrator must set a public hearing before the Board within thirty days. *Id.* § 165.50(5). Before a conditional use permit issues, the Board must "determine[ ] on the basis of specific information presented at the public hearing or contained in the application" the satisfaction of a number of conditions as follows:

A. The proposed conditional use will comply with all applicable regulations of the Zoning Ordinance, including, but not limited to lot requirements, use limitations and all other standards and conditions contained in the provision authorizing such use.

B. Adequate utility, drainage and other necessary facilities or improvements have been provided or will be provided.

C. Adequate access will be provided and designed so as to prevent traffic hazards and to minimize traffic congestion on public streets and alleys and on site.

D. All necessary licenses and permits required for the operation of the conditional use have been obtained, or it clearly appears that such permits are obtainable for the proposed conditional use on the property.

E. The location and size of the conditional use, the nature and intensity of the activities to be involved or conducted in connection with it, the size of the site in relation thereto and the size of the site with respect to streets giving access to the conditional use, shall be such that it will be in harmony with appropriate and orderly development of the district and the neighborhood which it is located.

F. The location, nature and height of buildings or structures on the site and nature and extent of the landscaping and screening on the site shall be such that the use will not reasonably hinder or discourage appropriate development, use or enjoyment of adjacent land, buildings or structures.

G. The proposed conditional use will not cause substantial injury to the value of other property in the neighborhood in which it is located and will contribute to

and promote the convenience and welfare of the public.

*Id.* § 165.50(6)(A)-(G).

Unless the Board "acts" on an application within thirty days, it is deemed denied. *Id.* § 165.50(7). However, the Board is required to "render a written decision on the application for a conditional use permit within thirty . . . days after the close of the hearing." *Id.* § 165.50(8). Any decision of the Board must include "specific findings of fact supporting or granting the denial" of a permit or detailing conditions or restrictions imposed on such a grant. *Id.*

The impact of these procedures is that if an owner of a parcel of land zoned I–3 wishes to operate an adult-oriented business, he may do so upon obtaining a conditional use permit, so long as he complies with other zoning procedures unchallenged in this litigation.[8]

## II. Factual History of This Litigation.

Seven years before Dolls began operating in 1996, Coralville adopted an Urban Development Plan, where it contemplated condemning certain parcels of land as part of a broader development project. One such parcel was that upon which Dolls was operating. Although ownership of the property where Dolls was once located has since been transferred to the City, Coralville did not actually condemn any land owned by Grell. *See* Settlement Agreement 7, at ¶ 12 (indicating the agreement was "negotiated under *threat* of condemnation" (emphasis added)). Instead, Grell and the City reached a negotiated agreement on October 29, 2004, wherein the City paid $6.3–million for the property where Dolls was operating and a number of other properties. Pursuant to the agreement, Grell received $134,393 for re-

location expenses. The agreement further indicates Grell was required to vacate the property by April 1, 2005, or face a liquidated damages penalty. Dolls later stopped operating on the parcel of land sold to the City.

Before ceasing operations, Dolls was located in an area zoned I–2. It is undisputed that the City never attempted to enforce its ordinance requiring adult-oriented businesses to operate only on land zoned I–3. In fact, Coralville claims it has never enforced that provision against any adult-oriented business.

While negotiating the sale of his land to the City, Grell explored other parcels of land for relocation of Dolls. He claims to have "engaged in extensive consultations with City officials" to identify such a parcel. Grell claims the City Manager indicated that if Grell could locate a parcel zoned I–3, Dolls could be rebuilt there. Grell eventually purchased two parcels of land in Coralville separated by a highway (the "Bigelow property"). The parcel on one side of the highway was zoned R–1; the parcel on the other was zoned I–3. Grell contends he purchased these parcels at the suggestion of the City Administrator. The record does not show when Grell purchased the Bigelow property, but it is clear the purchase was complete before he sold to the City the property where Dolls was previously located. The parties do not appear to dispute that the parcel zoned I–3 was improperly zoned, as it was fewer than 250,000 square feet in area.

On July 26, 2004 (well before the sale of his land to the City was finalized), the City issued a Notice of Rezoning, indicating the City's Planning and Zoning Commission (the "Commission") was considering rezoning both parcels of the Bigelow property to I–2. On August 4, 2004, Grell filed a Notice

8. Left unchallenged are the City's "zoning permit" requirements applicable to property owners wishing to construct a building. Coralville, Iowa, Ordinances § 165.56; *see id.* § 165.50(11) (requiring a zoning permit "prior to beginning construction").

of Protest with the Commission. The Commission considered the rezoning issue later that same day. Grell and his wife, accompanied by their attorney, attended the meeting, where Grell expressed his opposition. Members of the Commission explained rezoning the Bigelow property was necessary to bring the lots into conformity with those around them, which were zoned I–2. The Commission also noted that the parcel zoned I–3 was not large enough to qualify for the I–3 zoning classification. The Commission recommended to the City Council that both properties be rezoned I–2. Following the meeting, one Commissioner told Grell that "[the Commission didn't] make the final decision on this, it will go on to [the City] Council."

On August 24, 2004, the Coralville City Council passed Ordinance 2004–1005, which rezoned both parcels of the Bigelow property to I–2. Neither Grell nor another representative of Dolls attended the meeting. Grell, after meeting with his attorney, decided he would not attend the meeting or protest the rezoning, as such a protest would have been a "futile and vacuous remedy." The City's decision to rezone the I–3 parcel to I–2 has not been appealed or otherwise challenged.

As noted above, Grell signed the Settlement Agreement with the City on October 29, 2004, nearly one month *after* the City Council finalized rezoning the Bigelow property. It is therefore undisputed Grell knew he could not relocate Dolls to the Bigelow property upon the sale of the parcel where Dolls had been operating.

According to Dolls, rezoning the Bigelow property eliminated the only area in Coralville where an adult-oriented business could operate. However, in an affidavit submitted by Grell, he admits there is other I–3 property in Coralville but claims much of it is owned by the City. Grell Aff. ¶¶ 6, 9. Coralville points out that Dolls has not attempted to relocate to another properly zoned parcel in the City since signing the Settlement Agreement. The record shows Dolls has not submitted a site plan, applied for a building permit, sought a zoning variance, or taken any other action to relocate or reopen.

Dolls filed a fifteen count Complaint on February 23, 2005. Counts 1 through 14 allege the occurrence of numerous constitutional violations, and Count 15 sets forth an equitable estoppel claim. Dolls' constitutional claims are summarized in the following table:

| | | |
|---|---|---|
| First Amendment | Count 1 (Compl. ¶ 56) | "Free Expression" |
| | Count 2 (Compl. ¶ 57) | "Prior Restraint" |
| | Count 3 (Compl. ¶ 58) | "Chilling Effect" |
| | Count 8 (Compl. ¶ 63) | "Free Association" |
| | Count 10 (Compl. ¶ 65) | "Inadequate Safeguards [f]or Prompt Judicial Review" |
| | Count 11 (Compl. ¶ 66) | "Free Speech Suppression" |
| | Count 12 (Compl. ¶ 67) | "Overbreadth" |
| | Count 13 (Compl. ¶ 68) | "Restrictions Without Alternatives" |
| | Count 14 (Compl. ¶ 69) | "Unbridled Government Discretion" |
| Fifth Amendment | Count 9 (Compl. ¶ 64) | "Illegal Taking" |
| Fourteenth Amendment | Count 4 (Compl. ¶ 59) | "Equal Protection" |
| | Count 5 (Compl. ¶ 60) | "Arbitrary and Capricious" Application |
| | Count 6 (Compl. ¶ 61) | "Unlawful Exercise of Police Power" |
| | Count 7 (Compl. ¶ 62) | "Vague and Indefinite" |

With two exceptions, each constitutional claim is made on facial and as-applied bases. Dolls' overbreadth claim (Count 12) is made on a facial basis only. Dolls' claim that the City's regulatory scheme was "arbitrary and capricious *as applied* " to Dolls (Count 5) is clearly made on an as-applied basis only.

Coralville has moved to dismiss each claim on varying grounds. First, citing Federal Rule of Civil Procedure 12(b)(1), Coralville argues the Court cannot exercise jurisdiction over the constitutional claims presented in Dolls' Complaint. Coralville also claims each count should be dismissed as moot because Dolls has gone out of business. Finally, Coralville claims dismissal is proper because Dolls' claims are not ripe and Dolls lacks standing to bring them.

Second, citing Federal Rule of Civil Procedure 12(b)(6), Coralville claims Dolls' facial constitutional challenges fail to set forth claims upon which relief could be granted. Coralville also urges dismissal of Dolls' equitable estoppel claim because the Complaint does not establish what Coralville would be estopped from doing should Dolls succeed. The City also argues that Dolls forfeited any potential estoppel claim it could have had by signing the Settlement Agreement. It claims that "[t]o the extent [Dolls] attempts to retain the benefits of settlement and assert equitable claims which functionally attempt to undue [sic] the agreement, [Dolls] has 'unclean hands' which would deny [it] any equitable relief, including estoppel."

## DISCUSSION

■ Before embarking on a discussion of the state of the record in this case, a small number of issues may be hewed out up front, particularly with respect to Dolls' numerous (and overlapping) First Amendment claims. The First Amendment guar-

antees that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The First Amendment's Free Speech Clause has been incorporated into the Fourteenth Amendment's due process clause, making it applicable to state actors. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). This is true even though the text of the Amendment applies only to restrictions drafted by Congress. *See* U.S. Const. amend I. The panoptic patchwork of jurisprudence pieced together by the Supreme Court in its opinions carved from the text of the First Amendment is therefore applicable to the City.

■ Although by its terms the First Amendment applies only to speech, it has been interpreted to protect " 'live entertainment, such as musical and dramatic works,' and artistic expression containing nudity or simulated sexual conduct." *Ways v. City of Lincoln*, 274 F.3d 514, 518 (8th Cir.2001) (quoting *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); citing *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58, 95 S.Ct. 1239, 43 L.Ed.2d 448; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 933, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)). No activities that have occurred or would occur within Dolls' walls are obscene, *see* Compl. ¶ 16 ("[Dolls] does not intend the performance to be, nor are the performances, obscene."), and thus denied First Amendment protection, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene ...." (footnote omitted)); *Republican Party of Minn. v. White*, 416 F.3d 738, 749 n. 4 (8th Cir.2005) (en banc) (recognizing that lewd

and obscene speech "enjoy no First Amendment protection"). As a result, the activities Dolls wishes to foster are entitled to some, but not absolute, First Amendment protection; how much is the issue with respect to the bulk of Dolls' claims. *See SOB, Inc. v. County of Benton,* 317 F.3d 856, 859 (8th Cir.2003) ("Non-obscene erotic and sexually explicit speech are entitled to *some* First Amendment protection." (emphasis added)).

## I. Applicable Procedural Standards.

Rule 12(b)(1) requires dismissal if the Court lacks jurisdiction over the subject matter of an action. Fed.R.Civ.P. 12(b)(1), (h)(3). Rule 12(b)(6) requires dismissal if a plaintiff fails to state a claim upon which relief could be granted. *Id.* R. 12(b)(6). Coralville argues each of Dolls' claims should be dismissed because none are justiciable under constitutional principles of mootness, ripeness, and standing. Coralville argues that under any (or all) of these doctrines, the Court lacks jurisdiction, rendering dismissal proper. Coralville also claims each of Dolls' facial constitutional challenges as well as its equitable estoppel claim fail to state claims upon which relief could be granted. As a result, Coralville urges the Court to dismiss these claims as well.

## II. The City's Motion to Dismiss for Lack of Jurisdiction.

Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to actual cases or controversies. U.S. Const. Art. III § 2. Over a century ago, the Supreme Court articulated the elementary requirement that a court have jurisdiction over a cause of action before proceeding. *See Ex Parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). There, the Court ruled that if jurisdiction is found lacking, "the only function remaining to the court is that of announcing the fact and dismissing the

case." *Id.* This principle has been oft repeated. *E.g., Vt. Agency of Nat'l Res. v. United States,* 529 U.S. 765, 778–79, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); *Steel Co. v. Citizens for A Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Starr v. Mandanici,* 152 F.3d 741, 747 (8th Cir.1998); *Flittie v. Solem,* 882 F.2d 325, 326–27 (8th Cir.1989) (collecting cases); *Lewis v. Internal Rev. Serv.,* 691 F.2d 858, 859 (8th Cir.1982). Consequently, the Court begins with an analysis of whether subject matter jurisdiction exists over each of Dolls' claims in light of principles of standing, mootness, and ripeness divined from the case-or-controversy requirement of Article III.

### A. Legal Principles Governing Rule 12(b)(1) Motions.

To succeed on its Rule 12(b)(1) motion, Coralville must successfully "challenge [Dolls' Complaint] on its face or the factual truthfulness of its averments." *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993). Herein lies a distinction between "facial" and "factual" challenges to subject matter jurisdiction. *See Biscanin v. Merrill Lynch & Co.,* 407 F.3d 905, 907 (8th Cir.2005); *Titus,* 4 F.3d at 593; *Osborn v. United States,* 918 F.2d 724, 729–30 & n. 6 (8th Cir.1990). Facial challenges are limited to analyzing the face of the complaint, *Biscanin,* 407 F.3d at 907; factual challenges invoke facts other than those pled in the complaint, *Osborn,* 918 F.2d at 729 n. 6. *See BP Chems. Ltd. v. Jiangsu Sopo Corp.,* 285 F.3d 677, 680 (8th Cir.2002) (construing a challenge as facial "because [the defendant] limited its attack to allegations in [the plaintiff's] amended complaint").

■ If a party makes a facial challenge, each factual statement the complaint contains is presumed true. *Biscanin,* 407 F.3d at 907; *BP Chems.,* 285 F.3d at 680; *Titus,* 4 F.3d at 593; *Osborn,* 918 F.2d at

729 n. 6. A moving party's motion can be "successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus,* 4 F.3d at 593. If a party mounts a factual challenge, however, the Court may look outside the pleadings to determine whether jurisdiction exists, and the nonmoving party loses the benefit of favorable inferences from its factual statements. *Id.; Osborn,* 918 F.2d at 729 n. 6. "[S]upplemental affidavits," *Douglas v. Brownell,* 88 F.3d 1511, 1515 n. 6 (8th Cir.1996), deposition testimony, *Satz v. ITT Fin. Corp.,* 619 F.2d 738, 742 (8th Cir.1980), "other documents," *Osborn,* 918 F.2d at 730, and live testimony, *Osborn,* 918 F.2d at 730, are all appropriate for consideration.

Coralville does not claim Dolls failed to comply with Federal Rule of Civil Procedure 8(a)(1), and rightly so: the Complaint sufficiently avers the existence of subject matter jurisdiction. Instead, relying in part on affidavits submitted by Olson, Coralville alleges Dolls lacks standing and is bringing unripe and moot claims. Thus, the City challenges the truthfulness of facts in the Complaint. Accordingly, the Court construes the City's challenge as factual, not facial. As a result, where appropriate, the Court will consider documents spanning the entirety of the record when ruling upon the instant motion, *see Faibisch v. Univ. of Minn.,* 304 F.3d 797, 801 (8th Cir.2002) ((" '[T]he trial court is free to ... satisfy itself as to the existence of its power to hear the case.' ") (quoting *Osborn,* 918 F.2d at 730) (omission by the *Faibisch* court)), resolving factual conflicts it contains along the way, *see McClain v. Am. Econ. Ins. Co.,* 424 F.3d 728, 734 (8th Cir.2005); *W. Neb. Res. Council v. Wyo. Fuel Co.,* 641 F.Supp. 128, 129–30 (D.Neb. 1986), *cited in Faibisch,* 304 F.3d at 801, and *Osborn,* 918 F.2d at 728 n. 5.

■ As always, the Court will do so mindful of the fact that Dolls, as the party urging the Court to exercise jurisdiction, bears the burden of proving by a preponderance of the evidence that it has standing, *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.,* 424 F.3d 840, 843 (8th Cir.2005) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)), and is bringing ripe claims, *Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 347 (2d Cir.2005), but that the City, which asserts some of Dolls' claims are moot, bears a "heavy burden of proving" so, *Kennedy Bldg. Assocs. v. Viacom, Inc.,* 375 F.3d 731, 745 (8th Cir.2004).

**B. Standing.**

The analysis begins with whether Dolls has standing to bring its claims because "[w]hether a plaintiff has standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.' " *McClain,* 424 F.3d at 731 (quoting *Steger v. Franco, Inc.,* 228 F.3d 889, 892 (8th Cir.2000)).

In its motion, Coralville argues Dolls lacks standing to bring any of the claims set forth in its Complaint. In its brief, the City refines its challenge to address only Dolls' constitutional claims, so the Court will restrict its analysis to Dolls' constitutional claims. *See* LR 7.1(d) (2006) (requiring a brief to "contain[ ] a statement of the grounds for the motion"); *id.* R. 7.1(i) (a brief "*must* address only the particular facts and legal issues under consideration" (emphasis added)).

"[S]tanding 'is perhaps the most important of [the jurisdictional] doctrines.' " *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (second alteration by the *FW/PBS* Court). It is firmly established that " '[i]f a party lacks standing, the district court

has no subject matter jurisdiction.'" *Young Am. Corp.*, 424 F.3d at 843 (quoting *Faibisch*, 304 F.3d at 801). It is also "long-settled ... that standing cannot be 'inferred argumentatively from averments in the pleadings.'" *FW/PBS*, 493 U.S. at 231, 110 S.Ct. 596 (quoting *Grace v. Am. C. Ins. Co.*, 109 U.S. 278, 284, 3 S.Ct. 207, 27 L.Ed. 932 (1883)). Instead, standing "'must affirmatively appear in the record.'" *Id.* (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)).

As noted above, Dolls, "the 'party who seeks the exercise of jurisdiction in [its] favor,'" bears the burden of proving each element of standing. *Id.* (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)); *see Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Young Am. Corp.*, 424 F.3d at 843. To meet this burden, Dolls must adduce "'facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute.'" *FW/PBS*, 493 U.S. at 231, 110 S.Ct. 596 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). And because the standing requirement is not a "mere pleading requirement[ ]," Dolls must support each element "in the same way as any other matter on which [it] bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004). Because this case is "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [it is] presum[ed] that general allegations embrace those specific facts that are

necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quotation marks omitted); *accord Bennett v. Spear*, 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Delorme*, 354 F.3d at 815–16.

Dolls must establish facts sufficient to satisfy both constitutional and prudential standing requirements. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004); *Delorme*, 354 F.3d at 815. The three-part test articulated by the United States Supreme Court in *Lujan v. Defenders of Wildlife* guides the constitutional standing analysis:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations and footnote omitted); *accord Newdow*, 542 U.S. at 12, 124 S.Ct. 2301; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Young Am. Corp.*, 424 F.3d at 843; *McClain*, 424 F.3d at 731; *Delorme*, 354 F.3d at 815. To be injured in a "particularized" way, a plaintiff must be injured "in a personal and individual way." *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130.[9]

---

9. Even if Dolls could satisfy the constitutional components of standing, it must still not run afoul of judicially-imposed prudential limitations on standing designed to prevent courts from being "called upon to decide abstract questions of wide public significance even though other governmental institutions may

### 1. Dolls' As-applied Claims (Excluding Counts 2, 3, and 12).[10]

#### a. Injury in Fact Traceable to Conduct of the City.

First, Dolls must have suffered an injury in fact that is fairly traceable to conduct of the City. *Newdow*, 542 U.S. at 12, 124 S.Ct. 2301; *Friends of the Earth*, 528 U.S. at 180–81, 120 S.Ct. 693; *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130; *Young Am. Corp.*, 424 F.3d at 843; *McClain*, 424 F.3d at 731; *Delorme*, 354 F.3d at 815.

The City argues Dolls has suffered no injury resulting from its ordinances requiring conditional use permits or ordinances regulating where adult-oriented businesses may locate. The City claims "[t]he only suggested injury relates to [Dolls] having to vacate its [old] location by April 1, 2005, or pay the $16,000 of [sic] contractual liquidated damages the City bargained for and [Dolls] agreed to in return for $6,300,000." The City further contends that because Dolls has gone out of business, "there is no real or even possible affect [sic] on it from the ordinance." Finally, the City posits that because Dolls has not requested a zoning variance, submitted a site plan, or attempted to reopen, many of the challenged ordinances have not been applied to Dolls, making an injury resulting from their application impossible.

Dolls responds by arguing that it "clearly has suffered an injury due to the City's actions," because it "is out of business due to the City's actions, and there are no relocation sites available" for it to reopen. From this statement, it follows that the harm Dolls complains of is its closure and subsequent inability to reopen.

■ When a plaintiff challenges an ordinance as applied to its conduct, it must have " 'experienced a direct injury or will soon sustain a direct injury.' " *Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton*, 320 F.3d 849, 850 (8th Cir.2003) (quoting *Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 326 (8th Cir.1999)). Typically, and not surprisingly, regulations must actually be applied before a plaintiff can challenge them on an as-applied basis. *E.g.*, *United States v. Neset*, 235 F.3d 415, 420 n. 3 (8th Cir.2000) (holding that the plaintiff could not establish a "causal connection between the alleged violation of his First Amendment rights and the FCC's failure to issue" a license or grant a waiver because the plaintiff "ha[d] not applied for a license or requested a waiver"); *T.L.J. v. Webster*, 792 F.2d 734, 739 n. 5 (8th Cir.

---

be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth*, 422 U.S. at 500, 95 S.Ct. 2197. The Supreme Court has recently "explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' " *Newdow*, 542 U.S. at 12, 124 S.Ct. 2301 (quoting *Allen*, 468 U.S. at 751, 104 S.Ct. 3315). *But see Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130 (treating the particularized injury requirement as a constitutional, and not a prudential, requirement). Here, Article III standing principles extinguish Dolls' as-applied claims, so a thorough discussion of prudential standing would be surplusage.

10. The standing analysis for facial overbreadth challenges premised on the First Amendment differs somewhat, so those claims are analyzed separately. *See New York State Club Assoc., Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 791–92 (8th Cir.2004); *SOB*, 317 F.3d at 864–66. The standing analysis for Dolls' prior restraint claim also differs, so that claim is analyzed separately as well. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1987).

1986) (holding that a plaintiff lacked standing to challenge a statute on an as-applied basis because "it was not alleged that [the plaintiff] sought to use" the statute). Consequently, the analysis focuses on whether Dolls has been harmed by an application of the challenged ordinances.

In this action, Dolls challenges section 165.30(4)(D) of Coralville's ordinances, which restricts adult-oriented businesses to areas of the City that are zoned I–3 and requires them to submit a site plan and propose a sign of particular dimensions. Also challenged is 165.32(6)(A), requiring I–3 zoned areas to be at least 250,000 square feet in area. Dolls also challenges section 165.50, which contains the City's conditional use licensing procedures, as well as sections 165.49 and 165.51, which contain provisional use permit and special exception permit procedures, respectively.

**i. Section 165.30(4)(D).**

■ Section 165.30(4)(D) contains three general requirements applicable to adult-oriented businesses. First, adult-oriented businesses can be placed only in areas zoned I–3. Second, the owner must provide a site plan. Third, the owner must propose one non-lighted sign no larger than four square feet.

Dolls (or its owner) is not the current owner of any I–3 zoned land. Dolls has not submitted a site plan and has not proposed a sign. Dolls therefore cannot trace an injury to an application of this section of Coralville's ordinances. Consequently, it lacks standing to challenge this ordinance on an as-applied basis.

**ii. Section 165.32(6).**

Section 165.32(6)(A) requires areas zoned I–3 to be at least 250,000 square feet in area. It is undisputed that one parcel of the Bigelow land was zoned I–3 when Grell purchased it, but because the parcel was not large enough, it was rezoned to a different classification. The record therefore shows that the City's application of section 165.32(6)(A) made a parcel of land owned by Grell ineligible to house adult-oriented businesses like Dolls. Consequently, Dolls can trace its inability to place its business on the Bigelow property, in part, to the City's application of this section. For purposes of the current analysis the Court accepts Dolls has thus alleged the occurrence of an injury traceable to an action of the City with respect to this section.

**iii. Section 165.49.**

Section 165.49 sets forth the requirements for provisional use permits. Only certain businesses are required to seek provisional use permits, and adult businesses are not among them. This section cannot have harmed Dolls, because it does not apply to Dolls' business.

Dolls does not have standing to challenge this section on an as-applied basis.

**iv. Section 165.50.**

By generally challenging the "conditional use procedures" used by the City, Dolls is in reality challenging section 165.50. Unfortunately for Dolls' claim, the City has never had an opportunity to apply this section to Dolls. Dolls has not submitted a conditional use permit application, has not paid an application fee, and has not submitted a site plan, as required by the City's conditional use permit procedures. Because this section has never been applied to Dolls, Dolls cannot have suffered an injury traceable to its application. Consequently, Dolls does not have standing to challenge this section on an as-applied basis.

**v. Section 165.51.**

Section 165.51 contains procedures an applicant must follow to obtain a special

exception permit. As with section 165.49, special exception permits are only required for certain types of businesses. Adult businesses are not among them. Therefore, Dolls cannot claim to be harmed by an application of this section. Dolls lacks standing to challenge this section on an as-applied basis.

### vi. Conclusion.

With the arguable exception of section 165.32(6)(A), the Complaint does not allege an application of any section of Coralville's ordinances. To the extent survival of its claims depends upon the City actually applying the challenged ordinances, Dolls lacks standing to bring them.

### b. Injury Redressed by Favorable Result.

The analysis now turns to whether any harm alleged by Dolls would be redressed by a favorable result. Necessarily, then, Dolls must demonstrate it has standing to pursue each type of relief it seeks. *Friends of the Earth,* 528 U.S. at 185, 120 S.Ct. 693 (2000). Dolls seeks two forms of relief. First, Dolls wishes the Court to declare the City's regulatory scheme relating to adult-oriented businesses violative of a number of constitutional provisions. Second, Dolls asks the Court to temporarily and permanently enjoin the City from applying and enforcing the challenged ordinances in the future.[11]

### i. Standing to Seek Injunctive Relief.

First, Dolls must demonstrate it has standing to seek injunctive relief. That is, Dolls must show that enjoining enforcement of the challenged sections of the City's ordinances will redress some alleged harm. *See, e.g., Am. Ass'n of Orthodon-*

*dists v. Yellow Book USA, Inc.,* 434 F.3d 1100, 1103–04 (8th Cir.2006) (concluding, that to qualify for injunctive relief, an injunction barring the conduct alleged must redress the injury alleged); *Heartland Acad. Cmty. Church v. Waddle,* 335 F.3d 684, 689 (8th Cir.2003) (requiring that injunctive. relief "will prevent the harm it identifies").

The analysis proceeds in two steps. First, Dolls must have alleged sufficient facts to show it has satisfied the threshold showing for injunctive relief established by the Supreme Court. Second, the analysis focuses on whether Dolls' decision to close its doors in search of a new place to open has any bearing on its ability to seek injunctive relief.

### (1) Threshold Showing for Injunctive Relief.

Dolls must allege that there is a " 'real and immediate threat of repeated injury' " to have standing to seek injunctive relief. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); *see Park v. Forest Serv. of the United States,* 205 F.3d 1034, 1037 (8th Cir.2000) (recognizing that where a plaintiff seeks "injunctive relief, the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm"). Past harm can be evidence of whether a real and immediate injury is threatened, but that evidence alone cannot suffice to show a plaintiff's standing to seek an injunction. *See Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669; *see also Mosby v. Ligon,*

---

**11.** Dolls also asks the Court to allow it to amend its Complaint to add state actors and other municipal employees who violated its constitutional rights. Compl. 9, ¶ c. This is

not a remedy; it is a reservation of the right to adjust the entities or individuals against whom a remedy is sought.

418 F.3d 927, 933 (8th Cir.2005) (holding that "a plaintiff seeking prospective relief against future conduct of defendants who caused injury in the past must show that she faces a real and immediate threat that she would again suffer similar injury in the future" (quotation marks omitted)). In fact, to have standing to seek an injunction, it is necessary for the Plaintiff to allege that the challenged conduct is "likely" to occur again, resulting in some kind of future injury. *Lyons*, 461 U.S. at 105, 103 S.Ct. 1660.

■ The analysis begins with the City's zoning ordinances. Dolls claims it "is and will be threatened with prosecution for continuing the presentation of expressive dance performances at . . . any alternative location not approved by the City." However, the record demonstrates the City has not enforced the vast majority of the challenged ordinances against Dolls or any other business. *See Young Am. Corp.*, 424 F.3d at 845 (holding that a plaintiff must produce evidence showing that it is "more than merely speculative that the relief requested would have any effect to redress the harm to the plaintiff" (quotation marks omitted)). The City Attorney contends that the City, to his knowledge, "has never . . . enforced the adult entertainment business zoning plan against [Dolls] or any other business." *See* First Olson Aff. ¶¶ 13. In fact, record shows that Coralville's ordinances were not enforced to close Dolls when it was operating in its previous location, even though it was operating on land zoned I–2. *Id.* ¶ 12. The tacit threat created by the very existence of the ordinance structure must be assessed against this backdrop of nonenforcement.[12]

Dolls' Complaint shows the only challenged section the City has ever actually applied is section 165.32(6)(A), which re-

quires areas zoned I–3 to be at least 250,-000 square feet in area. However, Dolls cannot show that a future or ongoing harm is likely to occur from an application of section 165.32(6)(A). If the City is barred from applying section 165.32(6)(A), dancers cannot immediately begin performing on the Bigelow property, because a number of other requirements must be met. *See, e.g.,* Coralville, Iowa, Ordinances § 165.32(4)(D) (requiring a site plan); *id.* § 165.52 (containing the (unchallenged) site plan procedures). Consequently, even if the Court entered an injunction barring the City from enforcing section 165.32(6)(A), the harm claimed, *i.e.*, being out of business, would not be remedied. Therefore, Dolls lacks standing to seek an injunction which would enjoin enforcement of section 165.32(6)(A).

Each of the other zoning regulations Dolls challenges are simply not applicable to the parcel of land Grell owns. If Dolls wishes to open an adult-oriented business, it must be located on land zoned I–3. The property Grell now owns is zoned I–2. Determining when (or if) the land will be rezoned is a matter of pure conjecture. As a result, whether the City will apply any zoning ordinances relevant to adult-oriented businesses in the future is a speculative endeavor the Court cannot pursue. *See Mosby*, 418 F.3d at 933–34; *cf. O'Shea* 414 U.S. at 497, 94 S.Ct. 669 ("[A]ttempting to anticipate whether and when these respondents will be charged with crime and will be made to [be subject to the challenged conduct] takes us into the area of speculation and conjecture."). But even if Dolls could show that the parcel were to be rezoned, it has not presented evidence showing the City intends to bar it from operating there. *Compare Eckles v. City of Corydon*, 341 F.3d 762, 767–68 (8th Cir.2003) (finding a plaintiff had standing

___

12. *See Alexander v. City of Minneapolis,* 928 F.2d 278 (8th Cir.1991).

upon showing that a city had "clearly outlined the actions it plan[ned] to take" upon cessation of the plaintiff's litigation), *with Alexander v. City of Minneapolis*, 928 F.2d 278, 282 (8th Cir.1991) (concluding a plaintiff lacked standing when "[t]he record revealed absolutely no attempt, threat, or plan by the City to enforce the adult ordinance against [the plaintiff]"). In short, it is speculative whether invalidating any of the zoning ordinances would allow Dolls to reopen.

Turning to the licensing ordinances, Dolls faces a similar fate. Guessing whether Dolls will one day apply for a conditional use permit is beyond the Court's power. *See O'Shea*, 414 U.S. at 497, 94 S.Ct. 669; *Mosby*, 418 F.3d at 934.

Dolls lacks standing to seek injunctive relief against the City with respect to each ordinance it challenges.

### (2) The Impact of Dolls' Inactive Status.

Citing *In re Milk Products Antitrust Litigation*, the City argues Dolls cannot seek injunctive relief because it is no longer open for business. In that case, the court dismissed a proposed class action brought by wholesale purchasers of milk and milk products alleging price fixing by a group of milk processors. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 432 (8th Cir.1999). The district court ruled that the proposed class representative lacked standing to seek injunctive relief because the representative had sold any interest in its potential class claims when it sold the assets of its business before joining the lawsuit. *Id.* at 433. The Eighth Circuit noted that even if the named plaintiff had retained an interest in the antitrust claims,

"its sale of the business cut[ ] against its adequacy and typicality as a sole class representative." *Id.* at 437. The court ruled the business was "out of business and therefore lack[ed] standing to seek injunctive relief." *Id.* Pertinently, the *Milk Products* court did not hold that *no* party had standing to bring the claims advanced, it merely held that the sale of the proposed representative's business assets meant it could not pursue the class claims. *See id.* (implying that the claim had not been extinguished because the proposed representative "faces the prospect of litigating with the ... purchasers over ownership of the ... claim").

Dolls concedes it is not presently operating an establishment where dancing occurs. However, the record does not show Dolls has sold the intangible assets of its business. For example, Dolls is still incorporated and possesses a liquor license. Additionally, the Settlement Agreement shows that a portion of the money Grell received from the sale of his land was to be used for relocation expenses. That a portion of the money Grell received was earmarked for relocation expenses shows the sale of the land upon which Dolls previously operated was not equivalent to the sale of the business as a going concern. Unlike Dolls, the plaintiff in *Milk Products* owned nothing. That case is therefore distinguishable.[13]

In response to the City's argument, Dolls quotes at length from the Ninth Circuit's opinion in *Clark v. City of Lakewood*, 259 F.3d 996 (9th Cir.2001). In that case, the plaintiff closed the adult business he operated after a city's regulatory scheme imposed unsustainable financial

---

13. *Milk Products* is also distinguishable because it "arose in the unusual context of the adequacy of the plaintiff to represent the class, and therefore the court's decision on standing is somewhat diluted by being blended with the class action criteria." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 325 (Minn.2003) (discussing *Milk Products* ).

losses upon his business. *Id.* at 1001, 1003, 1007. In an action against the city, the owner sought monetary, injunctive, and declaratory relief. *Id.* at 1003. The business owner, like Grell, made clear his intent to reopen if the ordinances were invalidated. *Id.* at 1006, 1008. The city, like Coralville, argued the plaintiff lacked standing to seek injunctive relief because his business was closed and was therefore no longer being harmed by the ordinances. *Id.* at 1008. The court ruled that the plaintiff had standing to seek injunctive and declaratory relief, finding that,

> the Ordinance's *indirect* forced closing of [the plaintiff]'s business by allegedly rendering it unprofitable is also sufficient to give [the plaintiff] standing to request an injunction. The claimed inability to operate his business (or continued daily losses if he reopened his business) is an injury in fact, that injury is caused by the Ordinance and an injunction stopping enforcement of the Ordinance would redress [the plaintiff]'s injury by allowing him to reopen his business free from the Ordinance's restrictions.

*Id.* at 1008. The City attempts to distinguish *Clark* by arguing that Dolls can point to no action by the City leading to Dolls' closure.

The record shows Grell purchased the Bigelow property, which the City subsequently rezoned. As a result of the City's application of section 165.32(6)(A), the City disqualified the Bigelow property from being able to house Dolls. *Clark* salvages this much for Dolls. But even if Coralville was enjoined from enforcing section 165.32(6)(A), Grell must still apply for, and be granted conditional use and zoning permits, which is a speculative endeavor. Unlike the plaintiff in *Clark*, preventing an application of the challenged ordinances that have been applied to Dolls would not allow Dolls to immediately reopen. *See id.*

At bottom, Dolls' presently being out of business does not alter the standing analysis with respect to Dolls' request for injunctive relief. Dolls still lacks standing to seek that type of relief, because it cannot show that an invalidation of the only ordinance that has ever potentially harmed it would allow it to open.

### ii. Standing to Seek Declaratory Relief.

Having concluded Dolls cannot seek injunctive relief, the analysis turns to whether Dolls can seek a declaration that the challenged ordinances are unconstitutional, as applied.

■ To have standing to seek declaratory relief, there must be " 'a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir.1993) (quoting *Caldwell v. Gurley Refining Co.*, 755 F.2d 645 (8th Cir.1985)). However, because this test "is imprecise, the decision of whether such controversy exists is made upon the facts on a case by case basis." *Id.* (citing *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)).

■ The analysis here largely tracks that above. *See United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 426–27 (8th Cir.1988) (requiring in a declaratory judgment action that the plaintiff show, *inter alia*, they have suffered some injury likely redressable by a favorable outcome). As above, most of the ordinances Dolls wishes the Court to declare unconstitutional are simply not applicable to the type of property Grell owns. And invalidating the one that has been applied (section 165.32(6)(A)) would not put Dolls back in business because Grell must still comply with the City's conditional use permit requirements. Just as be-

fore, speculating whether Grell will apply for such a permit is something the Court cannot do.

Dolls lacks standing to seek declaratory relief on its as-applied claims.

### c. Conclusion.

Dolls lacks standing to challenge many of the ordinances listed in its Complaint on an as-applied basis because many of them have not been applied, and still others cannot be applied to the type of property Dolls' owner presently owns. This reality makes it impossible for Dolls to have suffered some kind of harm resulting from those ordinances' application. Even with respect to the ordinance that arguably has been applied, Dolls has not alleged facts showing that either declaratory or injunctive relief would redress the harm Dolls claims it has suffered from that ordinance's application.

### 2. Dolls' Facial Claims (Excluding Counts 2, 3, and 12).

Dolls also seeks to have the conditional use and zoning ordinances applicable to adult-oriented businesses invalidated because they are facially unconstitutional. Most of Dolls' facial claims can be discarded up front. The Supreme Court recently noted that facial challenges,

> [n]ot only ... invite judgments on fact-poor records, but they entail a further departure from the norms of adjudication in federal courts: overbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different

parties and different circumstances from those at hand. Accordingly, we have recognized the validity of facial attacks alleging overbreadth (though not necessarily using that term) in relatively few settings, and, generally, on the strength of specific reasons weighty enough to overcome our well-founded reticence.

*Sabri v. United States,* 541 U.S. 600, 609–10, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (citations omitted). Although the Court's discussion centered on a challenge to a criminal statute, the Court noted more broadly that "facial challenges are best when infrequent," because such an approach "carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually bare-bones records." *Id.* at 608–09, 124 S.Ct. 1941 (quoting *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)) (alteration in the original). Here, Dolls has not pointed to authority allowing the Court to relax traditional standing rules with respect to nearly all of its non-First Amendment claims. For example, Dolls has not explained why it should be permitted to pursue a facial challenge on Equal Protection grounds without some evidence that the City *could* treat an adult entertainment club differently than a quarry. *See* Coralville, Iowa, Ordinances § 165.32(4)(B)-(C). Dolls has not claimed why it should be permitted to allege that the City's adult-use regulatory scheme effects a taking on its face when it has alleged neither it, nor any other business, has been deprived of anything as a result of anything the City has done.[14] And Dolls has not demon-

---

**14.** In fact, there is a reasonable argument that Dolls has abandoned its Fifth Amendment taking claim. At oral argument, Dolls' counsel said the following:

> I've looked at the Fifth Amendment claim. Judge, for purposes of this argument, *we're not going to pursue that.* The issue here is, and one that I think deserves clarification,

what's the connection between the eminent domain proceeding and the filing of the complaint? *It's not that Dolls was taken.* The settlement that was entered into, according to the plain language of that settlement, was done under threat of eminent domain. There's no fight to wage.... [W]e've got an eminent domain proceeding

strated why the Court should allow Dolls to strike Coralville's ordinances wholesale because they are vague and indefinite without explaining which terms are vague or indefinite and who, if anyone, those terms could harm.

■ The bulk of the parties' arguments are devoted to where Dolls' facial claims intersect with purported violations of the First Amendment. In that restricted arena, facial challenges permit plaintiffs to challenge laws "not because their own rights ... are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). However, this relaxed version of traditional *jus tertii* rules only lowers the bar with respect to the *prudential* limitations on standing, not the *constitutional* limitations. That is, a plaintiff must still meet each Article III standing requirement. *See Newdow,* 542 U.S. at 15 n. 7, 124 S.Ct. 2301 (classifying the general bar on litigating the rights of third parties not before the court as a "prudential limitation") (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59–80, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)); *City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, Souter, & Ginsburg, JJ.) ("[T]he threshold for facial challenges is a species of third party ... standing, which we have recognized as a prudential doctrine, and not one mandated by Article III of the Constitution." (citing *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786

(1984))); *Whitmore v. Arkansas,* 495 U.S. 149, 161 n. 2, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (finding, in *dicta,* unnecessary to decide whether "to relax the general prudential rule that a litigant 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'") (quoting *Warth,* 422 U.S. at 499, 95 S.Ct. 2197) (emphasis added); *Mosby,* 418 F.3d at 933–34 (requiring a claimant to demonstrate Article III standing on facial claims). Therefore, to challenge the City's ordinances facially, Dolls must demonstrate a harm fairly traceable to conduct (or anticipated conduct) by the City. *See Osediacz v. City of Cranston,* 414 F.3d 136, 141 (1st Cir.2005) (requiring a plaintiff mounting a facial attack on a collection of city policies to "demonstrate that she satisfies the constitutional minima essential to establish standing," including, most pertinently, an injury in fact).

■ Unlike Dolls' as-applied challenges, it is not necessary for an ordinance to be applied before an injury in fact can be alleged when alleging a First Amendment violation. *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). However, if a statute has not been applied, one of two types of injuries must be alleged. First, the plaintiff must have "'alleged an *intention* to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there [must] exist[ ] a credible threat of prosecution.'" *Ramirez v. Sanchez Ramos,* 438 F.3d 92, 98 (1st Cir.2006) (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Alter-

---

that silenced the speech that took place there, not that this was some sort of intentional act on the part of the city.

Tr. of Oral Arg. 36–37 (emphases added). Additionally, the record is completely devoid of any evidence of an "eminent domain proceeding." The record does contain, however, a settlement agreement reached *before* the initiation of any eminent domain proceedings.

natively, a plaintiff must be "chilled from exercising [its] right to free expression or forego[ ] expression in order to avoid enforcement consequences." *Id.* (quotation marks omitted). In either situation, there must exist an actual threat that the challenged ordinances would be applied if the plaintiff exercised its right to free expression.

A recent First Circuit opinion provides an excellent illustration. In *Osediacz v. City of Cranston,* the plaintiff sued a city and a number of its officials for policies allowing private entities to erect holiday and other seasonal displays on public land subject to approval of the mayor. *Osediacz,* 414 F.3d at 137. The plaintiff argued, among other things, that the policies constituted a violation of the First Amendment's free speech guarantee, and that the policies were facially unconstitutional. *Id.* at 138. The plaintiff "did not aver ... that she herself harbored any interest in erecting a display." *Id.*

The First Circuit held that the plaintiff lacked standing to mount a facial challenge to the policies. *Id.* at 143. Although the plaintiff did not have to "show that the mayor actually denied her permission to erect a display," or that she had ever made such a request, she needed to present "evidence sufficient to indicate an objectively reasonable possibility that she would be subject to the allegedly unconstitutional mayoral approval requirement" to give her standing to bring a facial claim. *Id.* Because the plaintiff did not allege she was deterred from proposing a display as a result of the policy or that it was reasonable to foresee the policy being enforced against her, she lacked standing. *See id.* at 142–43.

■ A like situation exists here. Unless and until Dolls owns a parcel of I–3 land, the conditional use permit procedures cannot be applied to any land Dolls owns. Dolls is therefore not threatened by their existence. Although Grell avers he wishes to reopen Dolls if it succeeds in this litigation, he has not submitted that he intends to apply for a conditional use permit. Dolls therefore cannot claim to be within the class of persons or businesses chilled by those procedures, if, in fact, such deterrence has in the past occurred or will occur in the future. *See id.* at 142 (" 'Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.' " (quoting *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972))).

The foregoing demonstrates why Dolls lacks Article III standing to bring most of its facial challenges premised on alleged First Amendment violations. Two claims in particular, however, require more detailed discussion.

### 3. Dolls' Prior Restraint Claim (Count 2).

This analysis first focuses on Dolls' claim that the City's licensing scheme, on its face, is an unconstitutional prior restraint. Dolls argues it is unnecessary for it to apply for or be denied a conditional use permit before it has standing to challenge ordinances requiring such a license on a facial basis as an unconstitutional prior restraint.

In classic form, prior restraint occurs where the government requires some type of permit or license in order for speech to occur. Requiring permission from a city manager before being permitted to distribute literature, *see Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), requiring a permit before being permitted to use sound amplification devices, *see Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), and requiring a permit before being allowed to hold a parade or demonstration, *see Cox v.*

*New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), all constitute prior restraints. The Supreme Court has recognized "that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (4–3 decision); *see also id.* at 756 & n. 6, 108 S.Ct. 2138 (collecting cases); *cf. id.* at 766 n. 10, 108 S.Ct. 2138 ("It would be foolish ... to require [the appellant] to place a newsrack on city property illegally in order to obtain standing to challenge the ordinance."). A party subject to such a law automatically has standing to challenge it. *See Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." (quoted in *City of Lakewood,* 486 U.S. at 756, 764, 108 S.Ct. 2138)); *cf. Blue Moon Entm't, LLC v. City of Bates City,* 441 F.3d 561, 565–66 (8th Cir.2006) (holding that it is not necessary for a plaintiff to apply for, and be denied, a conditional use permit in order to show irreparable harm for preliminary injunction purposes). However, the Court has recognized that it is necessary that the regulation being challenged "give[ ] a government official or agency substantial power to discriminate based on the content or viewpoint of *speech.*" *City of Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138 (emphasis added). That is, if the ordinance is to be applied, it must threaten the exercise of speech. Therefore, the Court has required the statute challenged to have "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.*[15]

■■■ Initially, the party challenging the licensing scheme must be "subject to the law" challenged. *City of Lakewood,* 486 U.S. at 755, 108 S.Ct. 2138. For example, a party distributing newspapers, would quite obviously be "subject to" a law regulating newsracks. *See id.* at 755–56 & n. 10, 108 S.Ct. 2138. Here, Dolls may not even be "subject to" the conditional use permit ordinances because it is not the owner of an I–3 parcel of land.

In any event, there are two features of a licensing scheme "which, at least in combination," can justify facial challenges on prior restraint grounds. *See id.* at 759–60, 108 S.Ct. 2138. First, if the license

---

**15.** The Court identified twin evils to such regulations: self-censorship and undetectable censorship. First, the Court recognized that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood,* 486 U.S. at 757, 108 S.Ct. 2138. The Court recognized that such "[s]elf-censorship" cases cannot be brought on an as-applied basis because the unfettered discretion permitted by the regulation is never actually exercised. *See id.* Second, the Court recognized that "the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.* at 758, 108 S.Ct. 2138. Without requiring adherence to certain "guideposts," the Court realized that a government official could deny a permit for censorial reasons but clothe that decision in "shifting and illegitimate criteria," making it difficult to decide "whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.*

scheme requires applicants to apply for multiple licenses over time or renew their licenses, it is possible for "the licensor [to] not necessarily view the text of the words about to be spoken, but [to] measure their probable content or viewpoint by speech already uttered," thus raising concern that the licensor is covertly censoring speech based on its viewpoint or content. *Id.* at 758–59, 108 S.Ct. 2138. That concern is not present here because the conditional use permit ordinances applicable to adult-oriented businesses in Coralville do not require a holder to periodically renew its license or apply for a new license after the passage of an interval of time, so long as the holder commences work authorized by the permit within a year of its issuance.

*See* Coralville, Iowa, Ordinances § 165.50(9).

Second, the Court concluded that a facial challenge to an ordinance requiring a license could lie if the licensing system "is directed narrowly and specifically at expression or conduct commonly associated with expression." *City of Lakewood,* 486 U.S. at 760, 108 S.Ct. 2138.[16] In contrast, a licensing system containing "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken." *Id.* at 760–61, 108 S.Ct. 2138. The Court highlighted laws requiring building permits as an archetype, noting that such laws

---

**16.** The Eleventh Circuit in *Lady J. Lingerie, Inc. v. City of Jacksonville,* cited by Dolls, did not address this second feature. *See Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1362 (11th Cir.1999). There, the court permitted an application of what it called "neither precise nor objective" criteria to applicants who were not entitled to First Amendment protection, but barred the "application of the otherwise-valid zoning criteria to adult businesses." *Id.* at 1362. A regulation's narrow and specific application to "expression or conduct commonly associated with expression" was what the *City of Lakewood* Court found troubling; the regulations in *Lady J. Lingerie* apparently suffered no similar ill. *Lady J. Lingerie* is therefore inapposite.

It is not, as Dolls' counsel asserted at oral argument "not the character of the restriction but the character of the right involved that drives the analysis." Tr. of Oral Arg. 31. It is both. Looking at what right is restricted in what way *is* the analysis. The principle that a challenged ordinance must be directed narrowly and specifically at speech before it can be facially invalidated has been affirmed. *E.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 126–27, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (analyzing an ordinance specifically addressing prerequisites to holding parades, assemblies, demonstrations, and other related activities); *FW/PBS,* 493 U.S. at 225, 110 S.Ct. 596 (O'Connor, J.) ("[E]ven assuming the correctness of the city's representation of its 'general' inspection scheme, the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses.... [T]herefore, ... petitioners may raise a facial challenge to the licensing scheme ...."); *Ward v. Rock Against Racism,* 491 U.S. 781, 787–88 & n. 2, 793–95, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (analyzing guidelines designed to force users of a public band-shell to use a private sound company retained by a city, but concluding an extensive analysis regarding whether the respondent "should be permitted to bring a facial challenge" was unnecessary because the "respondent's facial claim fails on its merits"); *Steele v. City of Bemidji,* 257 F.3d 902, 906–08 (8th Cir.2001) (striking down regulations requiring a permit before a person could solicit contributions, or "place, deposit, display, or offer for sale any fence, goods, or obstructions upon, over, or across any public property" as prior restraints); *see also Riley v. Nat'l Federation of the Blind,* 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (citing *City of Lakewood* for the proposition that if a regulation is enacted "requiring periodic licensing of speakers, at least when the law is *directly* aimed at speech, it is subject to First Amendment scrutiny to ensure that the licensor's discretion is suitably confined" (emphasis added)).

are "rarely effective as a means of censorship." *Id.* at 761, 108 S.Ct. 2138. For laws without a close nexus to speech, it is appropriate to wait until they are applied to provide courts with "a yardstick with which to measure the licensor's occasional speech-related decision." *Id.* Comparing one application to another would then reveal whether speech is incidentally curtailed based on a fair application of the statute or intentionally curtailed based on the message the speech contains.

■ Here, a conditional use permit is required not only by adult-oriented businesses, but also by other businesses operating in industries having nothing to do with conduct commonly associated with expressive speech. Rendering facilities and adult cabarets alike must apply for the same permit. *See* Coralville, Iowa, Ordinances § 165.32(4)(D)-(E). Consequently, what is being regulated is not conduct commonly associated with expression; what is being regulated is where certain types of buildings, regardless of what expression happens inside them, may be located. *See, e.g., The Tool Box v. Ogden City Corp.,* 355 F.3d 1236, 1242–43 (10th Cir.2004) (en banc) (holding that a group of covenants are not susceptible to a facial First Amendment challenge because "they apply to every business" seeking to locate in a certain area of the city, thus falling into the category of "law[s] of 'general application'") (quoting *City of Lakewood,* 486 U.S. at 760, 108 S.Ct. 2138); *ATM Express, Inc. v. City of Montgomery,* 376 F.Supp.2d 1310, 1326 (M.D.Ala.2005) (holding that an ordinance is not subject to facial attack because "[a]lthough it applies to businesses whose commercial aim is to sell speech, it applies as well to those whose commercial aim is to sell steel, sand, snake oil and soccer balls" and because "there is a strong likelihood that most of the businesses licensed under its scheme are not identified by their distribution of spoken or written expression"); *see also*

*Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 62–63, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality op.) (concluding that an ordinance allowing adult films to be exhibited only in "licensed theaters" cannot be a prior restraint because all motion picture theaters were subject to the licensing restriction, even in light of a "locational restriction not applicable to other theaters"). The conditional use permit ordinances here are "laws of general application." And since the record is completely devoid of evidence (or allegations) that the regulatory scheme has been applied in a way highlighting the existence of licensing decisions based on the content of speech, Dolls cannot challenge the regulatory scheme facially as a prior restraint.

Because the conditional use permit ordinances are laws of general application, Dolls cannot challenge them as a prior restraint without first applying for a permit. *See City of Lakewood,* 486 U.S. at 760, 108 S.Ct. 2138; *The Tool Box,* 355 F.3d at 1243.

### 4. Dolls' Facial Overbreadth Claims (Counts 3 and 12).

■ Like Dolls' prior restraint claim, that many sections of Coralville's ordinances have not been applied in an unconstitutional way is not necessarily fatal to its facial overbreadth claim. The Supreme Court has recognized that "in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County,* 505 U.S. at 129, 112 S.Ct. 2395; *see also Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Two areas in particular are appropriate for facial overbreadth challenges: "where every application creates an impermissible risk of sup-

pression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth County*, 505 U.S. at 129–30, 112 S.Ct. 2395 (citations omitted); *accord FW/PBS*, 493 U.S. at 223, 110 S.Ct. 596. This "departure from" traditional standing rules, *Alexander v. United States*, 509 U.S. 544, 555, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), "is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court," *Forsyth County*, 505 U.S. at 129, 112 S.Ct. 2395, but who are "contemplating conduct protected by the First Amendment," *Klobuchar*, 381 F.3d at 791 (quotation marks omitted); *accord SOB*, 317 F.3d at 864; *Ways*, 274 F.3d at 518. *See also Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (providing this "expansive remedy" because of a concern that the mere "threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech . . . ."); *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (recognizing an exception to general standing principles when a claim is based on First Amendment overbreadth grounds because of " 'a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression' " (quoting *Broadrick*, 413 U.S. at 612, 93 S.Ct. 2908)); *Schad*, 452 U.S. at 66, 101 S.Ct. 2176 (holding that parties bringing claims "rooted in the First Amendment, . . . are entitled to rely on the impact of [an] ordinance on the expressive activities of others as well as their own.").[17]

In addition to showing that another party has been deterred from engaging in speech as a result of the challenged legislation, a plaintiff can establish an injury in fact for standing purposes "even if the plaintiff has not engaged in the prohibited expression ·as long as the plaintiff is objectively reasonably chilled from exercising [its] First Amendment right to free expression in order to avoid enforcement consequences." *Klobuchar*, 381 F.3d at 792; *cf. Schad*, 452 U.S. at 66, 101 S.Ct. 2176 (requiring chill on "the expressive activities of others *as well as* [the plaintiff's] own" (emphasis added)).

The number of adult-oriented businesses in Coralville is not many, but Dolls does not allege this absence is due to the City's ordinances. In fact, the Complaint is completely devoid of allegations that the rights of others not before the Court have been affected in any way by the City's ordinances regulating adult-oriented businesses. *E.g.*, Compl. ¶¶ 56–69 (referring repeatedly to "rights guaranteed Plaintiff" but not rights guaranteed other parties). Consequently, Dolls has not alleged any "deterrent or chilling effect" the City's regulatory scheme has on "those contemplating conduct protected by the First Amendment." *Klobuchar*, 381 F.3d at 791 (quotation marks omitted); *accord SOB*, 317 F.3d at 864; *Ways*, 274 F.3d at 518.

With respect to Dolls itself, Dolls has not claimed it has been "chilled from exercising [its] First Amendment right to free expression in order to avoid enforcement consequences" posed by the adult use regulatory scheme. *Klobuchar*, 381 F.3d at

---

17. This concern is at its apogee when an "overbroad statute imposes criminal sanctions." *Hicks*, 539 U.S. at 119, 123 S.Ct. 2191. Coralville's ordinances impose no such punishment.

792. Dolls did not remove itself from its old location as a result of any action taken by the City to enforce its ordinances. That decision was prompted by a long-standing community development project and reached as part of a freely negotiated settlement agreement. And Dolls' decision not to reopen has nothing to do with the City's regulations that place any amount of discretion in City officials. Dolls cannot reopen on the Bigelow property because the parcel of land upon which it wishes to open is not large enough to be eligible to house the type of business Dolls operates.

Dolls has not alleged either itself or another business or person has been deterred from engaging in expressive speech for fear of the enforcement consequences flowing from the City's ordinances. As a result, Dolls has not alleged sufficient facts to demonstrate standing to bring a facial overbreadth challenge.

### 5. Conclusion.

Dolls lacks standing to bring its constitutional claims on either facial or as-applied bases.

### C. Mootness.

Coralville also claims that because Dolls does not seek a monetary remedy, but instead seeks only injunctive and declaratory relief, Dolls' cessation of business activities at its old location moots all of its claims. Dolls responds by stating that it has held, and continues to hold, a desire to reopen in Coralville, but has been unable to do so as a result of the City's zoning and licensing ordinances. As noted above, a party claiming a controversy is moot bears the burden of proving so. *Kennedy Bldg. Assocs.*, 375 F.3d at 745.

A case becomes "moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's*

*A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (additional quotations omitted)); *see also City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001). If a case presents no case or controversy as a result, dismissal is required because any opinion rendered would be advisory. *Pap's A.M.*, 529 U.S. at 287, 120 S.Ct. 1382; *Ali v. Cangemi*, 419 F.3d 722, 723–24 (8th Cir.2005) (en banc). Unlike standing, mootness depends on the state of the record at time of review, not at the time an action is commenced. *Ali*, 419 F.3d at 724. Mootness typically arises when a plaintiff sues a defendant, but the defendant ceases the challenged conduct and argues the claims advanced are moot. *E.g.*, *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221–22, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000); *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693. Here, though, Coralville claims that because Dolls has stopped operating while it seeks a new home, its claims are moot.

Coralville relies on *City News & Novelty, Inc. v. City of Waukesha* for the proposition that once Dolls closed its doors in search of a new location, any claims it may have had automatically became moot. In that case, a store selling sexually explicit materials challenged a city's decision to refuse to renew the store's adult business license. *City News & Novelty*, 531 U.S. at 281–82, 121 S.Ct. 743. The denial withstood state administrative proceedings and judicial review in the state courts. *Id.* at 282, 121 S.Ct. 743. The Supreme Court then granted certiorari to review the business's claims. *Id.* Two months after petitioning for review before the Supreme Court, the store "gave notice that it would withdraw its renewal application and close its business upon the City's grant of a license to another corporation." *Id.* at

282–83, 121 S.Ct. 743. Thereafter, the store neither "pursue[d] nor currently expresse[d] an intent to pursue a license." *Id.* at 283, 121 S.Ct. 743. The city contended the business's claims became moot. *Id.* The business argued the case remained fit for adjudication because "it ha[d] never promised not to apply for a license in the future." *Id.* (quotation marks omitted).

The Court distinguished *Erie v. Pap's A.M.*, where an adult business attempted to moot a controversy to insulate a favorable decision from review, noting that there, the "controversy persisted, even though the adult business had shut down," because the municipality would have been "saddled with an 'ongoing injury,' *i.e.*, the judgment striking its law." *Id.* at 283–84, 120 S.Ct. 1382 (discussing *Pap's A.M.*, 529 U.S. at 287–305, 120 S.Ct. 1382). In *City News & Novelty*, however, the Court concluded that "a live controversy is not maintained by speculation that [the store] might be temporarily disabled from reentering a business that [it] left *and* ... asserts no plan to reenter." *Id.* at 285, 121 S.Ct. 743 (emphasis added). Importantly, the test articulated was conjunctive. *See id.*

■ It is undisputed that Dolls is presently "disabled from reentering the business that [it] left." *Id.* Dolls owns no land zoned I–3, and is has neither applied for, nor been denied, a conditional use or zoning permit. Under the City's zoning and licensing ordinances scheme, it cannot presently construct an adult-oriented business anywhere in the City.

The applicability of *City News & Novelty* therefore boils down to whether Dolls "currently asserts" an intent to reopen. *See id.* at 283–85, 121 S.Ct. 743. Coralville claims Dolls "has simply never expressed any tangible intent to relocate after receiving ... payment under the Settlement Agreement." However, although Dolls is not currently operating, it is still incorpo-

rated and it possesses a liquor license. Dolls' owner has expressed a "firm, conclusive, and unwavering" desire "to continue operating ... an adult dance establishment." *See* Grell Aff. ¶ 13 ("I want to reopen Dolls as an adult entertainment business."). *City News & Novelty* is therefore distinguishable; Dolls' owner expresses an intent to reopen.

The City's reliance on *Board of License Commissioners v. Pastore* is also misplaced. In that case, the Supreme Court granted certiorari to consider whether the Fourth Amendment's exclusionary rule applied in civil liquor license revocation hearings. *Bd. of License Comm'rs v. Pastore*, 469 U.S. 238, 238, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985) (per curiam). After the Court "issued a writ of certiorari ..., considered briefs on the merits, and commenced oral argument," it was disclosed that the business challenging the revocation of its license had gone out of business. *Id.* at 239, 105 S.Ct. 685. As a result, "no decision on the merits by th[e] Court [could] have an effect on the" business's license. *Id.* The Court declared the case moot. *Id.*

In *Pastore*, the business had no liquor license to pursue because it had closed. Here, although Dolls has sold the building where it once operated, it persists as a business entity. *Compare Alexander*, 928 F.2d at 280–81 (holding that where the owner of an adult business lost ownership of his business as a result of forfeiture procedures, the owner's challenge of regulations pertaining to his businesses became moot). So long as Dolls continues to express a desire to reopen in Coralville, the claims contained in its Complaint remain live.

The Court concludes Dolls' decision to close does not moot any claims it otherwise may advance.

### D. Ripeness.

■ Finally, the Court considers whether Dolls' claims, in their present posture, are ripe for review. Like mootness, but unlike standing, whether a case is ripe for review depends on the state of the record at the time of review, not at the time a complaint is filed. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 139–40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Pub. Water Supply Dist. No. 8 v. City of Kearney*, 401 F.3d 930, 932 (8th Cir.2005); *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039–40 (8th Cir.2000).

■ The City correctly notes that the ripeness inquiry presents a blend of Article III and prudential considerations. *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993); *In re Bender*, 368 F.3d 846, 847–48 (8th Cir.2004); *Mo. Soybean Ass'n v. United States Envtl. Prot. Agency*, 289 F.3d 509, 512 (8th Cir.2002); *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958 (8th Cir.2001). Our circuit has explained that "[t]he touchstone of a ripeness inquiry is whether the harm asserted has 'matured enough to warrant judicial intervention.'" *Vogel v. Foth & Van Dyke Assoc., Inc.*, 266 F.3d 838, 840 (8th Cir.2001) (quoting *Paraquad*, 259 F.3d at 958). If claims depend on "'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" they are unripe. *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)) (additional quotations omitted). Therefore, it is key whether a harm alleged has "been 'felt in a concrete way by the challenging part[y].'" *Reno*, 509 U.S. at 57, 113 S.Ct. 2485 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). A concrete harm is required "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). And, of course, a party cannot shroud an immature claim in an action for declaratory judgment. *See* 42 U.S.C. § 2201(a) (requiring an "actual controversy" in a declaratory judgment action); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (requiring an actual controversy before permitting an application of the Declaratory Judgment Act); *Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 572 (8th Cir.2003) (same).

■ Despite the Supreme Court's recognition that "[t]he difference between an abstract question and a 'case or controversy' is one of degree ... and is not discernible by any precise test," *Babbitt*, 442 U.S. at 297, 99 S.Ct. 2301, a two-part test has been fashioned to aid in the determination of whether a case presents ripe claims. Ripeness is tested by reviewing "both 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Pub. Water Supply Dist. No. 10*, 345 F.3d at 572–73 (quoting *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507); *accord KCCP Trust v. City of N. Kansas City*, 432 F.3d 897, 899 (8th Cir.2005); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Ohio Forestry Ass'n*, 523 U.S. at 733, 118 S.Ct. 1665; *Paraquad*, 259 F.3d at 958; *Neb. Pub. Power*, 234 F.3d at 1039–40. The "party seeking judicial relief must necessarily satisfy both prongs to at least a minimal degree." *Neb. Pub. Power*, 234 F.3d at 1039.

The first prong, whether a dispute is fit for judicial decision, " 'goes to a court's ability to visit an issue.' " *Pub. Water Supply Dist. No. 10,* 345 F.3d at 573 (quoting *Neb. Pub. Power,* 234 F.3d at 1038). This part of the analysis depends on whether a particular case "would benefit from further factual development." *Id.* If a case poses a purely legal question and is not contingent on future possibilities, it is more likely to be ripe. *Pub. Water Supply Dist. 10,* 345 F.3d at 573; *Neb. Pub.Power,* 234 F.3d at 1038.

■ To satisfy the second prong, a plaintiff must allege it " 'has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct.' " *Pub. Water Supply Dist. No. 10,* 345 F.3d at 573 (quoting *O'Shea,* 414 U.S. at 494, 94 S.Ct. 669). It is unnecessary for a plaintiff to actually be harmed, "but the injury must be 'certainly impending.' " *Paraquad,* 259 F.3d at 958–59 (quoting *Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301); *Employers Ass'n Inc. v. United Steelworkers of Am.,* 32 F.3d 1297, 1299 (8th Cir.1994). For example, if a plaintiff is forced to choose between discontinuing what is claimed to be lawful conduct and risking the consequences of violating a law, a claim challenging the law can be ripe if the enforcement consequences are severe enough. *Compare Abbott Labs.,* 387 U.S. at 152, 87 S.Ct. 1507 (holding that a pre-enforcement challenge was ripe because "the impact of the regulations ... is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage"), *with Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 165, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (holding a pre-enforcement challenge was not ripe because noncompliance would yield a small harm which could

"be promptly challenged through an administrative procedure"). Our circuit has "repeatedly stated that a case is not ripe if the plaintiff makes no showing that the injury is direct, immediate, or certain to occur." *Pub. Water Supply Dist. No. 10,* 345 F.3d at 573 (collecting cases). With these principles in mind, the analysis turns to Dolls' claims.

### 1. As-applied Challenges (Excluding Count 9).[18]

■ The City argues each of Dolls' as-applied claims are unripe because Dolls has neither sought nor received a final decision from the City. For example, it argues Dolls has neither applied for nor been denied a zoning variance, submitted a site plan, requested a building permit, or taken any action to allow Coralville to apply the provisions of the zoning or licensing ordinances Dolls challenges. Dolls responds by arguing that Grell provided the City Administrator with plans for a new location for his business, after which the City rezoned the Bigelow property. It argues it suffers from a "current injury" resulting from three separate actions taken by Coralville: "condemnation activities affecting the original Dolls site, ... directed rezoning of the new Dolls site, [and] the fact that [Coralville]'s adult entertainment legislation is facially invalid." As a result, Dolls argues, its claims cannot ripen further.

### a. Claims Fit For Judicial Decision.

As noted above, Dolls must first make a minimal showing that each of its claims are fit for judicial resolution. Focusing the analysis is whether the claims advanced would benefit from additional factual development. *Pub. Water Supply Dist. No.*

---

**18.** Because the ripeness inquiry differs for taking claims, that claim is analyzed separately.

*10*, 345 F.3d at 573; *Neb. Pub. Power*, 234 F.3d at 1038.

### i. First Amendment Claims.

The City's licensing and zoning scheme does not ban adult-oriented businesses altogether, it merely relegates them to certain parts of the City. As a result, to resolve Dolls' First Amendment claims on their merits, the Court must determine whether the City's ordinances, as applied, "restrain[ ] speech on the basis of its content," or, in a content-neutral way "serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Until the City applies the challenged ordinances to Dolls, it is hard to say precisely why the speech Dolls wishes to foster is being restrained, if it would be restrained at all. It is also difficult to tell whether the City's ordinances unreasonably limit the places to which Dolls could relocate. *See id.* These findings are determinative of the level of scrutiny applied to the City's ordinances. *See id.* Dolls' claims premised on purported First Amendment violations would certainly benefit from further factual development.

### ii. Due Process Claims.

Dolls' allegations that the City's zoning and licensing regulations, as applied, have violated its due process rights would also benefit from further factual development. Whether Dolls' due process rights were infringed by an "arbitrary and capricious" application of the City's regulatory scheme first requires that the challenged ordinances be applied. Claiming that persons of common intelligence "differ as to the application of the material terms of the challenged legislation" requires that the challenged legislation be applied. Assessing whether the ordinances, as applied, are an exercise of "unbridled government discretion," requires that governmental discretion actually be exercised.

With the exception of section 165.32(6), which Dolls lacks standing to challenge, Dolls does not allege any of Coralville's ordinances have been applied. Dolls' as-applied due process challenges would therefore benefit greatly from additional factual development.

### iii. Equal Protection Claim.

Finally, Dolls' claim that the regulatory scheme, as applied, offends the Equal Protection Clause, would benefit from further factual development. In some instances, a regulatory scheme may draw a line dividing certain types of speech and cast a more restrictive net upon speech on one side without offending equal protection principles. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (recognizing that it is possible to "accord[ ] differential treatment to even a content-defined subclass of proscribable speech" so long as "the regulation is '*justified* without reference to the content of the . . . speech' ") (quoting *Renton*, 475 U.S. at 48, 106 S.Ct. 925) (emphasis in the original); *Young*, 427 U.S. at 70–73, 96 S.Ct. 2440 (plurality op.). A municipality can use the content of certain types of speech "as the basis for placing them in a different classification from other [materials]." *Young*, 427 U.S. at 70–71, 96 S.Ct. 2440; *cf. R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538. How the divide is "justified" guides whether an Equal Protection principles have been offended. *See Young*, 427 U.S. at 71 & n. 34, 96 S.Ct. 2440 (finding that "[t]he record disclosed a factual basis" for the conclusion that the restriction placed would have the desired effect of "preserv[ing] the quality of urban life"); *cf. R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538. The record here is devoid of allegations that the City has enforced its ordinances

against adult-oriented businesses in a manner different than other businesses, or that the challenged ordinances have an impact on adult-oriented businesses that is different than other businesses.

Each constitutional claim challenged on as-applied basis would benefit from further factual development, *videlicet*, an application of the ordinances challenged.

### b. Potential Hardship.

The Court must also examine the hardship of the parties if it withholds consideration of the purported controversy pending further factual development. *Pub. Water Supply Dist. No. 10*, 345 F.3d at 572–73; *Paraquad*, 259 F.3d at 959; *Neb. Pub. Power Dist.*, 234 F.3d at 1039–40.

Dolls argues it is unnecessary for the ordinances to be applied before hardship can be inferred from delaying judicial review. Dolls is correct: application of a challenged ordinance is not always necessary for a claim to be ripe. *E.g., Abbott Labs.*, 387 U.S. at 152–53, 87 S.Ct. 1507. For example, in *South Dakota Mining Ass'n Inc. v. Lawrence County*, our circuit recognized that a party need not " 'await consummation of threatened injury' before bringing a declaratory judgment action," so long as an injury is " 'certainly impending.' " *S.D. Mining Ass'n, Inc. v. Lawrence County*, 155 F.3d 1005, 1008 (8th Cir.1998) (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301). There, mine owners challenged a zoning ordinance that prohibited new surface mining permits and barred amendments to existing permits in an area containing mines owned by the plaintiffs. *Id.* at 1007. No exceptions were permitted. *Id.* The court recognized that surface mining was the only method available to extract the relevant minerals from the land upon which the plaintiffs mining claims had effect. *Id.* at 1007–08. The plaintiffs sought an injunction against the ordinance's enforcement and a declaratory judgment that federal and state mining laws preempted the ordinance. *Id.* at 1008.

Despite the fact that the ordinance had not been enforced, the court ruled the plaintiffs' claims were still ripe. *See id.* at 1008–09. Noting that the ordinance allowed for no exceptions that would have allowed the plaintiffs to amend existing permits or obtain new ones, the court recognized that "applying for and being denied a county permit for surface metal mining would be an exercise in futility." *Id.*

Contrarily, in *KCCP Trust v. City of North Kansas City*, our circuit required a more concrete harm. There, a city retained an engineering firm to review its cable television infrastructure. *KCCP Trust*, 432 F.3d at 898. The firm recommended the city build and run a fiber-optic network, noting that providing cable-television service over the system would be necessary if the network were to be self-sufficient. *Id.* As planned, the network would not provide cable-television service without being connected to a cable television head end facility. *Id.* at 898 & n. 2. At the time, the city's plans did not call for the construction of or connection to a head end facility, and the city had not yet decided whether to provide cable-television service over the fiber-optic network. *Id.* at 898. Relying in part upon a purported violation of a state law, a cable television company sought to enjoin the city from using the fiber-optic network to provide cable-television service. *Id.* Recognizing that the cable television company's claim rested "on a contingent future event: the ownership of operation of a cable-television facility by the [c]ity," the court held the claim was unripe. *Id.* at 898–99. There was "no threat of [a] state law violation . . . because the antecedent cable-television facility d[id] not exist and its future existence [was] uncertain." *Id.* at 900.

Here, Coralville's zoning scheme allows adult-oriented businesses to operate in parcels zoned I–3 only after the issuance of a conditional use permit. Unlike the ordinances in *South Dakota Mining,* exceptions exist in the form of variances. *See* Coralville, Iowa, Ordinances § 165.54. Additionally, the "antecedent" act of applying for a conditional use permit to operate an adult-oriented business—ownership of an I–3 parcel—has not occurred in this case. And although Dolls alleges it "is and will be threatened with prosecution for continuing the presentation of expressive dance performances at ... any alternative location not approved by the City," the record shows the City has not enforced any portion of its ordinances specific to adult-oriented businesses against Dolls or another business. Indeed, there is no need for the City to apply nearly all of the provisions Dolls challenges, as Grell does not own a parcel of land that is zoned I–3. Any harm resulting from an application of those ordinances is, at this point, speculative. *See Nat'l Right to Life Political Action Comm. v. Connor,* 323 F.3d 684, 692–94 (8th Cir.2003) (ruling challenges to state election laws are unripe because the party challenging could "discover that no threat of enforcement exists at all"), *Mo. Soybean Ass'n,* 289 F.3d at 512–13 (concluding claims were unripe when allegations "of harm [were] too remote to be anything other than speculative" (quotation marks omitted)).

The record reveals only one ordinance has actually been applied in this case: the provision mandating that a parcel may only receive an I–3 zoning classification if it is at least 250,000 square feet in area. That claim is also unripe because Dolls could have sought, but did not seek, a variance, nor did it appeal the City's decision to rezone. *See* Coralville, Iowa, Ordinances § 165.54 (giving the Board of Adjustment the power to vary "lot area regulations"); *id.* § 165.55 (establishing appeals procedures); *see also Country Club Estates, L.L.C. v. Town of Loma Linda,* 281 F.3d 723, 724 (8th Cir.2002) (deeming plaintiffs' claims "that the ordinance is unreasonable or invalid as applied to them" unripe because they "could have, but did not, seek a waiver").

The Court concludes none of Dolls' as-applied constitutional claims are ripe for judicial review.[19]

### 2. Facial Challenges (Excluding Count 9).

 The City argues Dolls' facial constitutional claims are unripe under the "prudential considerations" this matter presents. Citing *Digital Properties, Inc. v. City of Plantation* and *Beeline Entertainment v. County of Orange,* Coralville claims the Court should dismiss Dolls' facial claims as a matter of "judicial restraint."[20]

---

**19.** Coralville cites *Alexander v. City of Minneapolis* for the proposition that a city's choice to not enforce an ordinance means a claim to the ordinances is automatically unripe. This is incorrect. Although the *Alexander* court wrote that the business's claim there had yet to "ripen into an issue appropriate for [the] court to consider," that statement was in the penultimate sentence in the court's standing analysis. *Alexander,* 928 F.2d at 282. The court ruled that the city's decision not to subject the business to preliminary enforcement of the challenged ordinance, coupled with the reality that there was "no attempt, threat, or plan" by the city to enforce the ordinance at issue meant no "actual or threatened injury" resulted from the city's conduct. *Id.* (quotation marks omitted). This conclusion, of course, does not aid Coralville's argument that Dolls' claim is unripe.

**20.** Although neither party addresses the principle, application of an ordinance is not necessary to show it is ripe when making a facial challenge. *See, e.g., Times Film Corp. v. City of Chicago,* 365 U.S. 43, 45–46, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

In *Digital Properties*, business owners wished to convert a restaurant into a store within which an array of adult materials would be sold. *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 587–88 (11th Cir.1997). Before the business entered into a contract to purchase the facility, the city rezoned the property on which it stood. *Id.* at 588. The new zoning classification did not expressly permit or prohibit adult-oriented businesses. *Id.* Representatives of the business attempted to file remodeling plans, which were required before required permits would issue. *Id.* The business's representatives were eventually referred to an assistant zoning technician, who purportedly told the business owners the city's ordinances did not allow the proposed use. *Id.* The assistant zoning technician referred the representatives to the city's director of building and zoning. *Id.* at 588–89. Before meeting with that individual, the business owners filed a lawsuit challenging the constitutionality of the city's zoning scheme both facially and as-applied, claiming that the zoning technician's alleged comment that adult businesses were not permitted constituted an injury. *Id.* at 589. The Eleventh Circuit held the business's claims were unripe because the challenged ordinances had never been applied to the business. *See id.* 590–

91 & n. 4. Dismissing the plaintiff's facial claims "as a matter of judicial restraint," the court ruled that the plaintiff "failed to present a mature claim upon which a federal court could make a well-reasoned, constitutional decision." *Id.* at 591 n. 4 (quotation marks omitted).[21]

Dolls seeks to distinguish *Digital Properties* by arguing that the "plaintiff was not the subject of a local government condemnation process which forced the plaintiff's business to move." Unfortunately, neither was Dolls. The Settlement Agreement clearly shows the existence of a "threat of condemnation." The record shows Dolls stopped operating as part of a freely-negotiated agreement with the City.

Dolls also claims *Digital Properties* is inapposite because no "facially unconstitutional, conditional use procedure imposed on properties located within an appropriate zoning district and which met minimum footage requirements" were in play there. Even if this statement is true, it begs the ripeness question. That is to say, even if the City's regulatory scheme is actually facially unconstitutional, Dolls must still have ripe claims. Indeed, the regulatory scheme in *Digital Properties* *may* have actually been facially invalid; the plaintiff there simply did not ripen its facial claims into a justiciable issue. *See Digital Props.*, 121 F.3d at 591 n. 4.[22]

---

**21.** The City's reliance on *Beeline* is unpersuasive. Although the *Beeline* court found that the plaintiff had "failed to demonstrate an issue ripe for determination," the court immediately noted in a footnote that it did *not* hold that "any and all possible facial attacks by [the plaintiff] upon the statute would not be ripe for adjudication. Rather, as pled, the claims are deficient." *See Beeline Entm't Partners, Ltd. v. County of Orange*, 243 F.Supp.2d 1333, 1338–39 & n. 8 (M.D.Fla. 2003). Recognizing that the plaintiff's facial claims were likely unfit for adjudication because the relevant decision-making body had yet to render a final decision, the court merely noted that the claims presented *could* be ripe, but were not properly pled. *Id.* at 1339 & n. 8.

**22.** Dolls also seeks to distinguish *Digital Properties* because this case "does not represent a simple trip to a zoning counter." The record is devoid of allegations that the City Administrator has authority to act for the City on zoning matters. *See* Coralville, Iowa, Ordinances § 165.45 (listing duties of the City's Zoning Administrator), .50 (requiring approval of both the Board of Adjustment and Zoning Administrator); Compl. ¶¶ 29–30 (recognizing approval of the City Council was needed to approve rezoning of the Bigelow property); Second Olson Aff. ¶¶ 6–7. The *Digital Properties* Court noted the plaintiff failed to obtain a decision from "a city official with sufficient authority." *Digital Props.*, 121 F.3d at 590. Dolls' claims must suffer the same fate.

Neither has Dolls. Dolls' owner owns a parcel of land and has done nothing to ripen its claims except protest (but neither appeal, seek a variance, nor contest *post facto* ) the rezoning of that parcel. That ownership alone does not generate a ripe -controversy upon which the Court can decide thorny constitutional issues.

Because none of Dolls' as-applied claims are ripe, the Court, for prudential reasons, refuses to exercise jurisdiction over Dolls' facial challenges. *See Bender*, 368 F.3d at 848 (holding that the ripeness doctrine permits "federal courts to avoid wasting scarce judicial resources in attempts to resolve speculative or indeterminate factual issues").

### 3. Dolls' Taking Claim (Count 9).

As warranted above, the analysis returns to Dolls' taking claim.

#### a. As-applied Challenge.

■ An as-applied taking claim must be ripe in two different respects. First, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Koscielski v. City of Minneapolis*, 435 F.3d 898, 903 (8th Cir.2006); *Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 520 (8th Cir.2004) (hereinafter *"Eastern Railroad"*). A "final decision" requires the submission of all relevant plans and the seeking of variances and waivers. *See Williamson County*, 473 U.S. at 187–88, 105 S.Ct. 3108; *Palazzolo v. Rhode Island*,

533 U.S. 606, 620–21, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Second, the property owner must unsuccessfully seek compensation through any adequate procedures established by state law. *Williamson County*, 473 U.S. at 194–95, 105 S.Ct. 3108; *accord Koscielski*, 435 F.3d at 903; *Metzger v. Village of Cedar Creek*, 370 F.3d 822, 823–24 (8th Cir.2004); *Eastern Railroad*, 362 F.3d at 520; *see also San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, ——, 125 S.Ct. 2491, 2493, 162 L.Ed.2d 315 (2005) (reaffirming the *Williamson County* Court's proclamation that taking claims "are not ripe until a State fails to provide adequate compensation for the taking" (quotation marks omitted)).

■ The record shows Dolls' has not sought a variance which would permit the construction of an adult-oriented business on the Bigelow property. Dolls has not submitted a site plan and has not sought, or been denied, a zoning permit or a conditional use permit. The record therefore shows no final decision has been reached with respect to the application of each challenged regulation. Additionally, the record also demonstrates Dolls has not pursued available state procedures to seek just compensation.

Dolls' as-applied taking challenge is therefore unripe. *See Williamson County*, 473 U.S. at 186–88, 194–95, 105 S.Ct. 3108.

#### b. Facial Challenge.

■ Neither party cites *Suitum v. Tahoe Regional Planning Agency*, where the Supreme Court recognized that facial taking challenges are generally ripe the moment the challenged regulation or ordinance is passed. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980

---

Finally, Dolls claims the plaintiff's property in *Digital Properties* was not rezoned "to take it outside of adult business zoning regula-

tions." Although that statement may be true, it is hard to see how it makes Dolls' claims more ripe.

(1997); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *accord Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir.2005); *Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 458 n. 13 (7th Cir. 2002); *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1357–58 (Fed.Cir. 2002).[23] Because such claims do "not depend on the extent to which the [plaintiff is] deprived of the economic use of [its] particular pieces of property or to the extent to which [it is] compensated," they are ripe when the ordinance challenged is passed. *Yee v. City of Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), *overruled in part, Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 2085–86, 161 L.Ed.2d 876 (2005). By virtue of the passage of the challenged ordinances, Dolls' claim that the City's ordinances facially effect a taking is ripe.[24]

### E. Conclusion.

None of Dolls' constitutional claims survive the City's Motion to Dismiss under Rule 12(b)(1) because Dolls lacks standing to bring them. The Court further concludes that each of Dolls' as-applied claims are unripe. Additionally, with the exception of Dolls' facial taking claim, the Court declines to exercise jurisdiction over any of Dolls' facial claims for prudential reasons. The City's Rule 12(b)(1) motion must therefore be granted. Only Dolls' equitable estoppel claim survives.

### III. Coralville's Motion to Dismiss for Failure to State a Claim.

Insofar as the City moves for dismissal of Dolls' constitutional claims on the basis that they fail to state claims upon which relief could be granted, that request is denied as moot. The analysis above disposes of Dolls' constitutional claims on the current record.

Other than alleging the existence of supplemental jurisdiction, the Complaint does not set forth a basis for the Court's exercise of subject matter jurisdiction over Dolls' state-law equitable estoppel claim. Retaining jurisdiction over this claim is therefore within the Court's discretion. 28 U.S.C. § 1367(c)(3); *see also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir.2006). At this early stage of the proceedings, the Court concludes it would be improper to retain jurisdiction over that claim.[25] Dolls'

---

**23.** In the Ninth Circuit, a party must still seek compensation through procedures a State has provided in order to bring ripe facial challenges. *E.g., Spoklie v. Montana*, 411 F.3d 1051, 1057 (9th Cir.2005) (citing *S.P. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 505–06 (9th Cir.1990)); *accord Ventura Mobilehome Communities Owners Ass'n v. City of San Buenaventura*, 371 F.3d 1046, 1052 (9th Cir.2004); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965–66 (9th Cir.2003).

**24.** In addition to noting Dolls lacks standing to challenge the City's ordinances on this basis, the Court notes that facial taking claims wage an " 'uphill battle,' since it is difficult to demonstrate that 'mere enactment' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.' " *Sui-*

*tum*, 520 U.S. at 736 n. 10, 117 S.Ct. 1659 (quoting *Keystone Bituminous Coal*, 480 U.S. at 495, 107 S.Ct. 1232; *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)) (alterations in the original). Dolls has not alleged that the mere existence of any of the City's ordinances have deprived it of all economic use of its property. Consequently, Dolls faces a substantial hurdle on the City's Rule 12(b)(6) motion on this claim, even if Dolls had standing to bring it.

**25.** The ability of Dolls to pursue its equitable estoppel claim, as pled, is no sure thing. In Iowa, parties "seeking to invoke the doctrine of equitable estoppel against a government body 'bear[ ] a heavy burden, particularly when the government acts in a sovereign or governmental role rather than a proprietary

equitable estoppel claim is therefore dismissed.

## IV. Conclusion.

The Court recognizes that the factual record of the case in its present posture is immature, and that particularly where "free speech issues [of] fundamental and far reaching import," are at stake, it should be particularly reluctant to decide a case on an "amorphous and ill-defined factual record." *Renne v. Geary,* 501 U.S. 312, 324, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). However, the state of this record is sufficient to conclude that Dolls brings claims which are simply not justiciable. Consequently, the Court lacks jurisdiction to hear them.

The City's Motion to Dismiss under Rule 12(b)(1) (Clerk's No. 9) is **granted** with respect to each of Dolls' constitutional claims. The remaining claim, Dolls' state-law equitable estoppel claim, is **dismissed** pursuant to the Court's authority under 28 U.S.C. section 1367(c)(3). The City's Motion to Dismiss under Rule 12(b)(6) is **denied as moot.**

**IT IS SO ORDERED.**

role.' " *ABC Disposal Sys. Inc. v. Dep't of Nat. Res.,* 681 N.W.2d 596, 607 (Iowa 2004) (quoting *Bailiff v. Adams County Conference Bd.,* 650 N.W.2d 621, 627 (Iowa 2002)). Generally, some "exceptional circumstance[ ]" is required, *id.; accord City of Akron v. Akron Westfield Cmty. Sch. Dist.,* 659 N.W.2d 223, 226 (Iowa 2003) ("[E]quitable estoppel is generally unavailable against a governmental body and is applied against a city only under exceptional circumstances."), particularly where a plaintiff wishes to interfere with a city's zoning ordinances, *see City of Lamoni v. Livingston,* 392 N.W.2d 506, 511–12 (Iowa 1986) ("A municipality is generally not estopped from enforcing its zoning regulations."). Dolls has not identified any "exceptional circumstances" that would permit it to interfere with Coralville's zoning ordinances. Additionally, Dolls has not alleged that Grell's purchase of a parcel of land clearly too small to house an adult-oriented business in reliance upon a statement issued by someone not authorized to give an opinion on the City's zoning scheme was reasonable.